UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| PAUL DAVIS | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| v. | § | CIVIL CASE NO. 4:24-CV-647 |
| | § | |
| JEFFREY LEACH, LYNN MARIE | § | |
| JOHNSON, WHITNEY DAVIS, | § | |
| JONATHAN CONE, EGGLESTON KING | § | |
| DAVIS LLP, and LILA DEAKLE, | § | |
| | § | JURY TRIAL DEMANDED |
| DEFENDANTS. | | |

**PLAINTIFF'S ORIGINAL PETITION AND
APPLICATION FOR INJUNCTIVE RELIEF**

COMES NOW, Plaintiff, PAUL DAVIS ("DAVIS" or "Plaintiff"), and brings this his

Original Petition and Application for Injunctive Relief against Defendants JEFFREY

LEACH, LYNN MARIE JOHNSON, WHITNEY DAVIS, JONATHAN CONE, EGGLESTON

KING DAVIS LLP, and LILA DEAKLE and respectfully represents the following:

**I.
PARTIES**

1.      Plaintiff PAUL DAVIS is a resident of Texas.

2.      Defendant JEFFREY LEACH is a member of the Texas House of

Representatives who is being sued in his personal capacity and who may be served with

process at 120 Westwood Dr., Murphy, TX 75094 or wherever he may be found.

3.      Defendant LYNN MARIE JOHNSON is a resident of Parker County, Texas

and is the presiding judge of County Court at Law No. 2 of Parker County, Texas, who is

being sued in her personal capacity and who may be served with process at One Courthouse

Square, Weatherford, TX 76086 or wherever she may be found.

4.      Defendant WHITNEY DAVIS is an individual who resides in Parker County, Texas and who may be served with process at 102 Houston Ave, Suite 300, Weatherford, TX 76086 or wherever he may be found.

5.      Defendant JONATHAN CONE is an individual who resides in Parker County, Texas and who may be served with process at 102 Houston Ave, Suite 300, Weatherford, TX 76086or wherever he may be found.

6.      Defendant EGGLESTON KING DAVIS, LLP is a Texas limited liability partnership that acts as its own registered agent and may be served with process at 102 Houston Ave, Suite 300, Weatherford, TX 76086.

7.      Defendant LILA DEAKLE is the County Clerk of Parker County, Texas who is being sued in her individual capacity and who may be served with process at One Courthouse Square, Weatherford, TX 76086 or wherever she may be found.

## II.
## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343 because this action alleges deprivations of constitutional rights, including a conspiracy to deprive.

9.      This Court has personal jurisdiction over defendants because they are residents of the State of Texas.

10.     Venue is proper in this district because one or more Defendants reside in this district and the events from which this action arises occurred in Parker County, Texas, which is located within this district.

### III.
### CONDITIONS PRECEDENT

11.     All conditions precedent to this action have occurred.

### IV.
### FACTUAL ALLEGATIONS

**A. The *McComb v. Leach* lawsuit.**

12.     DAVIS is an attorney licensed to practice in the state of Texas.  His practice is primarily devoted to civil rights and employment law.  DAVIS practices law as the managing attorney of Paul M. Davis & Associates, P.C., a Texas professional corporation.

13.     Sometime in March 2023, an organization known as the Texas Nationalist Movement, Inc. ("TNM") approached DAVIS to bring a defamation case on behalf of one of their staff members, Morgan McComb.  At the time, McComb was their director of block walking.

14.     TNM is an organization who believes that the federal government of the United States has so grossly overstepped its bounds under the U.S. Constitution and become so oppressive and tyrannical with little to no accountability to its citizens that the only hope for Texans to retain the freedoms guaranteed under the Texas Constitution is to undertake a democratic process for Texas to reassert its independence from the United States.

15.     The first step in this democratic process that TNM commonly refers to as "TEXIT" is the passage of a bill in the Texas Legislature to place a referendum on the general election ballot that would allow Texans to vote as to whether they desire for Texas to begin a process to reassert its independence from the United States and for that process to ultimately result in Texas independence.

16.     DAVIS, for his part, would certainly prefer for the United States to continue undivided as a republic but also recognizes the same concerns as TNM regarding the federal government grossly overstepping its constitutional bounds and is of the view that the TEXIT

movement may be a necessary wake up call to the federal government that states like Texas are not going to tolerate overreach.  Accordingly, DAVIS is sympathetic to TNM and the TEXIT movement.  DAVIS also identifies as a grassroots conservative and a supporter of the MAGA movement.

17.     One substantial challenge that TNM faces in its political advocacy is false public perception that TEXIT advocacy amounts to the crimes of treason and/or sedition notwithstanding TNM's advocacy does not fit the definitions of these crimes.

18.     LEACH is a vocal opponent of TEXIT who is a substantial contributor to this false public perception because he regularly claims on his X (formerly known as "Twitter") social media account that advocacy for TEXIT is treason and/or sedition.

19.     On March 6, 2023, former Texas House Representative Bryan Slaton filed a TEXIT Referendum Bill as HB 3596 and announced its filing on X.  On the same day, LEACH displayed his hostility for TEXIT and its supporters by reposting Slaton's X post with the following quote: "Any legislator who signs on to support this reckless, seditious, and treasonous bill will not pass a single bill this session.  This isn't a threat.  It's a promise."

20.     McComb responded to LEACH's comment by commenting: "@leachfortexas Are you accusing me of treasonous sedition?  A person who is tired of living under the boot of the federal govt.  Texans who love this state?"  LEACH responded to McComb's comment by reposting the comment with his own comment in which he stated: "If you believe that Texas should secede from the United States of American# [sic] – then yes.  Unequivocally yes."

21.     TNM contacted DAVIS to request that DAVIS file a defamation lawsuit for McComb alleging that LEACH's statement toward McComb is defamatory because it falsely accuses her of the crimes of sedition and/or treason.  TNM explained that McComb and many of its members and staffers frequently are subjected to similar false criminal accusations for their political activism and that a successful defamation lawsuit would be an important

remedy to the reputational damage to the TEXIT movement, TNM, and its members, including McComb, caused by such false accusations.

22.     DAVIS researched the matter and determined that a good faith argument could be made that the statement did constitute actionable defamation because a reasonable reader could believe that the statement was a statement of fact falsely accusing McComb of crimes.

23.     As set forth in both the Original Petition and Amended Petition DAVIS filed on behalf of McComb, DAVIS's theory was that LEACH'S statement is distinguishable from an analogous case where the Supreme Court of Texas held, in *Lilith Fund for Reprod. Equity v. Dickson*,[1] that accusing an abortion clinic of murder was not a statement of fact because a reasonable person would know that abortion is not a crime under the law that existed at that time, which was prior to the U.S. Supreme Court's reversal of *Roe v. Wade*.  *See* **Exhibit A**, Amended Petition and Original Petition.

24.     DAVIS's argument was that a reasonable reader in modern society cannot be expected to be equipped with the same level of knowledge about whether TEXIT advocacy constitutes the crimes of treason or sedition as they are with regard to whether abortion is a crime, as in the *Dickson* case.  In other words, DAVIS was attempting to do what is commonplace in the practice of law—arguing to distinguish existing precedent on a factual distinction.

25.     In the event the trial judge held that *Dickson* precluded liability against LEACH, DAVIS also planned to argue on appeal that if *Dickson* means that a reasonable person in today's society should be expected to understand the nuances of whether TEXIT advocacy would meet the legal definitions of the crimes of treason or sedition to the extent

---

[1] *Lilith Fund for Reprod. Equity v. Dickson*, No. 21-0978, 2023 WL 2193586 (Tex. Feb. 24, 2023).

that they should be expected to understand that LEACH's statement was not a statement of fact, then the *Dickson* opinion went to far and should be narrowed.

26.     DAVIS reviewed and collected evidence proving how generally ignorant Americans are with regard to matters of civics.

27.     LEACH could have avoided responding to the Amended Petition altogether merely by issuing a statement clarifying that he was not accusing McComb of the crimes of sedition or treason.  DAVIS sent a demand letter to LEACH, on April 17, 2024 requesting such a retraction.  *See* **Exhibit B**, Demand Letter.

28.     Instead, LEACH responded to the Amended Petition by filing a motion to dismiss pursuant to the Chapter 27 of the Texas Civil Practices & Remedies Code, the Texas Citizens Participation Act (the "TCPA").

29.     The purpose of the TCPA is to "protect[ ] citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern . . . by providing a mechanism for summary disposition of such suits." *Van Der Linden v. Khan*, 535 S.W.3d 179, 188 (Tex. App.—Fort Worth 2017, pet. denied).

30.     McComb's lawsuit had no impact on Leach's freedom of speech and would not have silenced him.  LEACH could still have stated an *opinion* that TEXIT is like treason or sedition.  He merely would not be able to imply that someone is committing the crimes of treason and sedition by advocating for TEXIT.  Since falsely accusing someone of a crime is not protected First Amendment speech, LEACH's rights would not have been violated at all. McComb and, by extension, TNM, merely wanted to clarify LEACH was not accusing TEXIT supporters of crimes.  McComb and TNM would have dropped the lawsuit if LEACH had simply made this clarification in response to the Demand Letter.  DAVIS also made comments suggesting as much on his social media.

6

**B.   TNM's expressive act in serving the lawsuit.**

31.    Because HB 3596, the "TEXIT Bill," was currently pending and the Texas legislature was in session, TNM wanted LEACH to be served as soon as possible with the lawsuit at the Texas Capitol and to hold an immediate press conference to call public attention to the fact that TEXIT advocacy is not treason or sedition.

32.    Correcting the false public perception of TEXIT advocacy being treason or sedition was of utmost importance to both TNM and McComb, and the act of serving LEACH publicly was expressive speech to make an emphatic public statement that TEXIT is not treason or sedition.

33.    Accordingly, DAVIS put TNM in touch with his usual process server, Casey Littlejohn, to have LEACH served at the Capitol.  Littlejohn and TNM determined that LEACH could be found and served in a committee hearing over which he presided.

34.    Littlejohn's service of the petition took only 27 seconds.  LEACH, however, took such umbrage at being served with process in a committee hearing that he discussed the method of service and the case on the record in the hearing for several minutes.  Hearing attendees unrelated to TNM or McComb could be seen on video snickering at LEACH's over-reactionary response as he unnecessarily droned on about the lawsuit and commented on McComb being a political opponent aligned with Bryan Slation, the sponsor of the TEXIT bill.

35.    Upon observing the video of LEACH being served, DAVIS, who also runs a news and opinion podcast, released a video on his Rumble.com channel and on X, in which he poked fun at the comical nature of LEACH's overreaction as an example of how many legislators believe they are above the common people because service of process in the workplace is commonplace because it is a location where individuals are easy to find, and it should not be unusual just because LEACH happens to work as a legislator in the Texas

Capitol.  Notably, DAVIS stated on the video that he had not expected the service of process to be funny but that LEACH's overreaction made it funny.

**C. LEACH's disproportional response to the lawsuit.**

36.    Instead of responding to the Demand Letter by issuing a retraction to clarify he was not accusing McComb of a crime, LEACH, apparently incensed by being served publicly with the lawsuit and by DAVIS's commentary in the Rumble video, conspired with his attorneys, WHITNEY DAVIS and JONATHAN CONE, to weaponize the TCPA against McComb and DAVIS to punish them by intentionally running up an extreme and excessive amount of unnecessary attorneys' fees in LEACH's Motion to Dismiss pursuant to the TCPA.

37.    The only two legal issues in LEACH's Motion to Dismiss, filed June 16, 2023, were (1) whether LEACH's statement toward McComb was a statement of fact or opinion and (2) whether McComb procured or invited the defamation.  **Exhibit C**, Motion to Dismiss, pp. 5–6.  To address these two discreet and uncomplicated issues, LEACH's attorneys and their staff spent an absurd number of hours preparing their 64-page Motion to Dismiss along with over 500 pages of exhibits that reflected an extreme number of hours on an internet fishing expedition for documents of remote and questionable relevance to LEACH's burden under the TCPA.

38.    Most of the contents of the Motion to Dismiss had nothing to do with what LEACH was required to prove under the TCPA for dismissal and, instead, focused on describing TNM, McComb, and DAVIS's political beliefs, speech, and activism.  LEACH demonized TNM's desire to defend its reputation by clarifying to the public that TEXIT advocacy is not a crime by calling it a "SLAPP strategy" to "silence its political opponents with defamation lawsuits."

39.    After prevailing on the Motion to Dismiss, LEACH then filed a First Amended Motion for Fees and Costs seeking $106, 871.25 in "reasonable and necessary attorneys' fees" related to the Motion to Dismiss.  **Exhibit D**, First Amended Motion for Fees and Costs.

40.    LEACH and his attorneys[2] almost certainly knew that the presiding judge, LYNN MARIE JOHNSON ("JUDGE JOHNSON"), was politically aligned with LEACH to the extent that she would grant such a patently outrageous amount of attorneys' fees for a single motion.  No reasonable person would otherwise have incurred over $100,000 in fees to defeat a relatively simple lawsuit that would have resulted in mere nominal damages— especially where the Motion to Dismiss could have been obviated by LEACH simply clarifying that he was not accusing McComb of any crime—unless the intent was collude with JUDGE JOHNSON to retaliate and punish DAVIS and McComb.

41.    LEACH spent most of the first 33 pages of his Motion to Dismiss alleging a "conspiracy" between TNM, McComb, and DAVIS to deprive LEACH of his First Amendment rights despite the fact that all that was requested of LEACH was to clarify that he was not accusing McComb of any crime.

42.    LEACH described McComb's political beliefs, speech, and activism in great detail, specifically describing her as a "self-styled 'TRUE Conservative TX Grassroots Leader,'" a "prominent MAGA-backing Republican campaign worker," a "North Texas tea party activist and organizer" and quoted her as saying that former Texas Land Commissioner, George P. Bush "can't be a true conservative."  **Exhibit C**, Motion to Dismiss, pp. 10–12.    LEACH then went on to detail McComb's statements on X in which she was critical of LEACH and expressed her disapproval of his political views and actions.

---

[2] Any reference to "LEACH" herein in regard to a filing or action taken in the *McComb v. Leach* lawsuit is also a reference LEACH's attorneys, WHITNEY DAVIS, JONATHAN CONE, and EKD, who are also referred to throughout as "LEACH'S attorneys" or "his attorneys."

43.     LEACH also described TNM's political beliefs, speech, and activism in great detail.  He describes TNM as "a political organization whose central mission is to bring about Texas's secession from the Union . . . . by engaging in a relentless public information campaign via traditional media, social media, public events, conferences, and other activities." *Id.*, p. 7.

44.     None of the foregoing statements in the Motion to Dismiss have any bearing on what LEACH was required to prove for dismissal under the TCPA.  Thus, the ostensible purpose of making such detailed descriptions of McComb's political views and activism was to send a political signal to JUDGE JOHNSON that McComb and, by association, DAVIS, should be punished for her "grassroots conservative," "MAGA," and "tea party" affiliations.

45.     LEACH accused DAVIS of "abuse of our judicial system" by representing McComb in her attempt to defend her reputation and her ability to effectively advocate for her political viewpoint by clarifying that her activities are not criminal in nature.  LEACH included multiple "Tweets" by DAVIS in which he cited instances of DAVIS accusing President Biden and members of his administration of treason as "evidence" that DAVIS filed the lawsuit in bad faith.  Unlike Leach's statement, however, the actions DAVIS described could actually constitute the crime of treason, and in any case, no one from the Biden administration reached out to DAVIS to ask for clarify as to whether he was accusing anyone of crimes.

**D.  LEACH seeks to sanction DAVIS for his protected activities.**

46.     On February 21, 2024, LEACH filed his Motion for Sanctions.  In the Motion for Sanctions, LEACH specifically referenced protected First Amendment activities by both DAVIS and McComb as grounds to request JUDGE JOHNSON jointly sanction DAVIS and McComb.

47.     The most salient instance of LEACH requesting JUDGE JOHNSON sanction DAVIS for protected First Amendment activity is where he states: "Before this lawsuit was filed, Plaintiff's counsel had a McKinney ISD school board member served with a lawsuit during an active school board meeting.  And he said his purpose in doing that was to go viral on the Internet."

48.     In fact, the service of that lawsuit—in which the plaintiffs recently defeated the defendant school board president, Amy Dankel's, motion for summary judgment—took place during the public comments segment of the meeting.  DAVIS signed up to speak during the public comments to make a speech to Ms. Dankel, rebuking her for the blatant First Amendment viewpoint discrimination he had observed at the previous month's meeting. DAVIS had his process server serve the Original Complaint and summons in that lawsuit— *Gonzales, et al. v. Dankel, et al.*, Case No. 4:22-cv-416, in the Eastern District of Texas— during his one-minute speech to express and highlight the serious nature of Dankel's behavior in violating constitutional rights.

49.     Despite the fact that this entire expressive act took place during the time designated for public comment and during DAVIS's own time for such commenting, LEACH request that DAVIS be sanctioned for this activity for "disrupting" a government proceeding. **Exhibit E**, Motion for Sanctions, pp. 18–19.  Such a request is an unequivocal admission that LEACH intended for DAVIS to be sanctioned because of his protected First Amendment activity and to deter him from any similar exercise of these rights in the future.

50.     As to LEACH's statement that DAVIS's purpose was to go viral on the internet, the purpose of serving Dankel during the speech was to bring public attention to the serious nature of Dankel's actions to rally public support behind the lawsuit because the plaintiffs in that case do not have the financial means to litigate their case.  Therefore, to hold Dankel

accountable, DAVIS knew that public attention would be necessary to attract needed donations for plaintiffs to proceed with the suit.  Indeed, as a result of the public attention to the matter created by DAVIS serving Dankel during his speech, the *Gonzalez* plaintiffs have been able to raise $16,350 as of the date of this filing for their lawsuit, all of which have been applied to litigate the lawsuit.

51.     Thus, DAVIS's expressive activity of having Dankel served during his speech has enabled individuals who would otherwise have had their civil rights trampled by a state official to have a means of receiving relief from a court.  Yet, LEACH and his attorneys asked JUDGE JOHNSON to sanction DAVIS for this expressive activity speaking out in defense of civil rights, and JUDGE JOHNSON did sanction DAVIS for this expressive activity.

52.     LEACH also attached DAVIS's Rumble.com video as an exhibit to his Motion for Sanctions as an additional basis for sanctioning DAVIS, saying that it was evidence of a "publicity stunt."  **Exhibit E**, Motion for Sanctions, p. 18.  Again, in doing so, LEACH sought to have DAVIS sanctioned in retaliation for protected First Amendment speech.

53.     Moreover, LEACH requested that DAVIS be sanctioned for instructing his process server to work with TNM to have LEACH served during a hearing at the Texas Capitol. TNM chose this method of service, in part, to bring public attention to the fact that TEXIT advocacy is not treason or sedition.  Serving an individual at their place of work is commonplace in the legal system.  Yet LEACH, his attorneys, and JUDGE JOHNSON all seem to believe that state legislators are in a special class of individuals who cannot be subjected to being served with process in the workplace.  DAVIS condemned and mocked this view of public officials in his video to which LEACH took offense and sought to have DAVIS punished with sanctions as a result.  The sanctions are also intended to punish DAVIS for his public comments and assisting TNM with their act of expression in having LEACH served at the Capitol in connection with their press releases concerning the lawsuit.  Thus, LEACH

sought to have DAVIS sanctioned for protected First Amendment expressive activity, speech, association, and political belief.

54.     In sworn testimony during the hearing on LEACH's Motion for Sanctions, LEACH's attorney, JONATHAN CONE admitted that he was unaware of any rule of ethics or case law authority that would characterize DAVIS's actions in having LEACH or DANKEL served publicly and talking about the service of process publicly as constituting some breach of ethics or improper purpose that merited sanctions.  Thus, CONE admitted he knew of no legitimate basis for requesting that DAVIS be sanctioned for this conduct.  Therefore, the request for sanctions for this conduct could only be in retaliation for DAVIS's exercise of his First Amendment right of expression and his association with TNM's political beliefs and its act of expression.

55.     LEACH also attacked DAVIS's freedom to associate with the TNM by stating that he brought the case "at the behest of the Texas Nationalist Movement (TNM), a political organization where Plaintiff—a veteran political operative—works."  **Exhibit E**, Motion for Sanctions, p. 2.  LEACH listed TNM's public statements in which it discussed how "the belief that secession amounts to treason and sedition is 'one obstacle'" to TNM's effective advocacy for TEXIT and in which it threatened to bring defamation lawsuits to stop these false accusations of criminal conduct.  *Id.* at pp. 15–21.

56.     LEACH also deceptively cited a statement by DAVIS: "In a podcast about this case, Plaintiff's counsel stated that 'we're just going to start suing people that want to accuse Texit supporters of treason or sedition" and that 'we're not going to put up with' people expressing opinions that equate secession with treason and sedition."  *Id.* at p. 20.  DAVIS, however, did not say in the podcast that he would "not put up with people expressing opinions," but made it very clear that any defamation lawsuit would be for a false accusation of the crime of treason and/or sedition."  *See id.* (media exhibits cited).  Accordingly, this is

13

another instance where LEACH requested JUDGE JOHNSON sanction DAVIS for his protected free speech.  The fact that LEACH knowingly mischaracterized DAVIS's words, evidences his malicious purpose.

57.    LEACH further requested DAVIS should be sanctioned on the basis that he made statements on X accusing President Biden and members of his administration for treason.  *Id.* at pp. 3.  DAVIS pointed out in McComb's response to LEACH's Motion for Sanctions, that he viewed these comments differently than LEACH's because he was pointing out that Biden and some of his cabinet members likely *were* engaged in treason by the acts described in his posts, such as aiding China by intentionally allowing a Chinese spy balloon to traverse the US and collect intelligence and intentionally allowing a foreign invasion of illegal immigrants to cross the border to do harm to the United States.  **Exhibit F**, McComb's Consolidated Response to Leach's Motion for Fees and Costs and Motion for Sanctions, pp. 14–15.  Nonetheless, LEACH, his attorneys, and JUDGE JOHNSON all ignored this and pretended that DAVIS was deserving of sanctions for his protected First Amendment speech.

58.    Accordingly, LEACH and his attorneys asked JUDGE JOHNSON to sanction DAVIS for statements he made on X that are protected by the First Amendment and that they reasonably should have known were not analogous to the statements that formed the basis for the defamation lawsuit against LEACH.

59.    As additional grounds to sanction DAVIS, LEACH went on to selectively quote from DAVIS's various X posts in which DAVIS gave his opinion about the case concerning the importance of the case against LEACH to TNM and McComb in clarifying to the public that TEXIT advocacy does not, in fact, constitute the crimes of treason and sedition.  **Exhibit E**, Motion for Sanctions, pp. 21–25.

60.    As additional grounds to sanction DAVIS, LEACH claimed that the lawsuit was so frivolous that it merited sanctions to deter future frivolous filings.  In doing so,

LEACH requested sanctions against DAVIS for doing exactly what attorneys routinely do as part of their profession—make an argument to distinguish existing precedent on the grounds that the facts of the current case justify a different result.  In requesting sanctions for a "frivolous" filing, LEACH showed his bad faith by falsely claiming DAVIS and McComb of "expressly and only relied on the Dallas Court of Appeals opinion" that was overturned by the Supreme Court of Texas in *Dickson*.  *Id.* at p. 12.; *see also* p. 14 (claiming DAVIS and McComb had "express and sole reliance" on the Dallas Court of Appeals case).  LEACH made these statements notwithstanding that DAVIS plainly cited to the Supreme Court of Texas opinion on the first page of both the Original and Amended Petitions and made it clear he was arguing to distinguish that case on the facts of McComb's case.  DAVIS only cited the Dallas Court of Appeals case to give the background and explain the legal issue as being a close call.  No reasonable attorney or judge reading the Original and Amended Petitions would conclude DAVIS was *relying* on overturned precedent as a basis for this lawsuit.  Thus, this misrepresentation of DAVIS's reliance on overturned precedent was further intentional and malicious retaliation against DAVIS for his protected First Amendment activity.

61.     LEACH further requested to sanction DAVIS on the grounds that he had filed another defamation lawsuit for McComb on the grounds that the defendant in that case, Jennifer Beauford, had falsely accused her of being a "convicted felon" and having "admitted" to "committing felonies," among other similar false accusations toward her personal character.  LEACH claimed, without explanation, that this lawsuit was "additional SLAPP litigation."  However, when questioned in the hearing on the Motion for Sanctions, CONE was unable to provide any basis for why McComb's other lawsuit constituted "SLAPP litigation."  Therefore, this was another baseless request for sanctions made in bad faith and retaliation against DAVIS for his political beliefs, associations, and speech that LEACH, his attorneys, and JUDGE JOHNSON do not like.

62.     Notably, Jennifer Beauford is a friend of County Clerk, DEAKLE and JUDGE JOHNSON and is politically aligned with them.

**E.  JUDGE JOHNSON adopts LEACH's Proposed Final Judgment in its entirety.**

63.     LEACH submitted a Proposed Final Judgment on June 12, 2024, ordering that DAVIS and McComb be "jointly and severely liable to Representative Leach" for sanctions "in the amount of $50,000 dollars."  The Proposed Final Judgment contained 18 pages of highly detailed findings clearly indicating that the sanctions were imposed because of the protected speech and conduct described above.  *See* **Exhibit G**, Proposed Final Judgment.

64.     *The next day*, JUDGE JOHNSON entered Final Judgment.  In her Final Judgment, JUDGE JOHNSON did not even change a single word of the Proposed Final Judgment.  She adopted it wholesale, rubber-stamping everything LEACH asked for without variation, including a judgment that McComb pay Leach $124,158.75[3] in attorneys' fees and costs.  *Compare* **Exhibit G** *with* **Exhibit H**, Final Judgment.

65.     Despite having notice that LEACH was attempting to sanction DAVIS for protected First Amendment activity through McComb's Consolidation Response to LEACH's First Amended Motion for Fees and Costs and Motion for Sanctions, and by the testimony and arguments at the hearing on the Motion for Sanctions, Judge Johnson assessed $50,000 of sanctions against DAVIS and McComb jointly and severally.

66.     Judge Johnson entered these sanctions despite declarations attached to the Response made under penalty of perjury from both DAVIS and McComb that they have a net worth approximately zero or below zero and meager means to pay sanctions.  DAVIS cited clear Texas precedent that sanctions are "not aimed to punish but rather only to deter" and

---

[3] LEACH had filed a supplement to his First Amended Motion for Fees and Costs adding additional fees and costs.

that the court must "consider the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction."

67.     At LEACH's request in the Proposed Final Judgment, JUDGE JOHNSON found DAVIS and McComb's statements under penalty of perjury not to be "credible." Judge Johnson's only stated evidence of this was that DAVIS had filed the other defamation lawsuit for McComb. However, McComb lost her job and ran out of money after the filing of this lawsuit and has been unable to pay for further litigation. JUDGE JOHNSON displayed her political bias in assuming DAVIS and McComb were lying without any objective evidence to make such conclusion.

68.     JUDGE JOHNSON's willingness to wholly adopted LEACH's highly detailed Proposed Final Judgment only one day after its filing, which assessed a patently excessive, extreme, and punitive amount of attorneys' fees and sanctions is evidence of her collusion with LEACH to retaliate against DAVIS and McComb for the protected First Amendment activities described herein and to target DAVIS because of his association with McComb and TNM and their political beliefs. The Proposed Final Judgment contained many statements that were either false and contradicted by the evidentiary record or that made assumptions about DAVIS and McComb's state of mind and intent that were unsupported by the evidentiary record.

69.     Nonetheless, Judge Johnson adopted the Proposed Final Judgment as her Final Judgment the very next day without changing a single word. A detailed explanation of the errors contained in the Final Judgment and the statements that reference DAVIS and McComb's political beliefs, associations, and speech is contained in **Exhibit I**, the Motion for New Trial McComb filed on July 5, 2025. DAVIS hereby incorporates the allegations in the Motion for New Trial as though fully set forth herein.

**F. The Final Judgment admits DAVIS is being sanctioned for protected First Amendment activity.**

70.     As described in the Motion for New Trial, the Final Judgment specifies that DAVIS and McComb were sanctioned because of their protected First Amendment activity, which includes their political beliefs, associations, and speech.  Specifically, the Final Judgment provides a detailed description of TNM's political beliefs and advocacy for TEXIT and associates McComb and DAVIS with TNM.  Though the McComb lawsuit against LEACH was to protect TNM and its members, including McComb, from being falsely labeled as criminals for their political advocacy, which has a detrimental effect on their political activity, the Final Judgment demonizes TNM, it's president, Daniel Miller, McComb, and DAVIS by assuming the worst possible motives for filing the lawsuit in hyperbolic fashion, saying it was filed in bad faith for multiple improper purposes, including to "intimidate, deter, silence, and prevent" LEACH and others from expressing their opinions.

71.     The Final Judgment grossly exaggerates the effect and potential effects of the lawsuit.  Instead of recognizing the reality that all LEACH had to do was merely clarify that he was not accusing McComb of any actual crime and face likely nominal damages if he refused to do so, the Final Judgment describes McComb's lawsuit as an abuse of the judicial process that would threaten the integrity of the judicial system.

72.     This hypocritical inversion of reality completely ignores that LEACH and his attorneys colluded to intentionally incur a grossly disproportional amount of attorneys' fees to the scope and complexity of the case to abuse the judicial system to exact punishment on McComb and DAVIS because of their political beliefs and activities related to TEXIT and their association with TNM.

73.     Incredibly, the Final Judgment even adopts the blatant and obvious lie that McComb and DAVIS predicated the lawsuit on overturned authority when they clearly cited

18

to the Texas Supreme Court opinion in an attempt to distinguish it in the pleadings. No reasonable judge could believe McComb and DAVIS predicated the lawsuit on overturned authority, so JUDGE JOHNSON particularly displays her political bias against McComb and DAVIS and for LEACH in adopting such an obvious falsehood.

### G. LEACH, his attorneys, and Judge Johnson had a meeting of the minds to retaliate against DAVIS and McComb for protected activity.

74.     The fact that Judge Johnson wholly adopted the many highly subjective, detailed, completely one-sided, grossly exaggerated, and unsupportable statements contained in the Final Judgment the next day after LEACH filed the Proposed Final Judgment without even changing a single word, strongly suggests that JUDGE JOHNSON acted on her political bias against McComb and DAVIS and in favor of LEACH.

75.     It is improbable that JUDGE JOHNSON could have sufficiently compared the 18 pages of highly detailed findings and conclusions with the record in the case to verify the same within the space of a single day. This gives the strong implication of likelihood that JUDGE JOHNSON had already made up her mind to side with LEACH because of her political bias and would simply rubber-stamp whatever LEACH and his attorneys proposed for final judgment.

76.     LEACH and his attorneys displayed their hostility for DAVIS, McComb, and TNM because of their protected First Amendment activity, including their political beliefs, speech, and associations in their various allegations contained in the Motion to Dismiss, Motion for Sanctions, and Proposed Final Judgment, all of which are incorporated by reference as though fully set forth herein.

77.     LEACH and his attorneys colluded with JUDGE JOHNSON in open court filings by asking her to sanction DAVIS because of his protected First Amendment activities, including his political beliefs, speech, and associations with TNM and McComb. JUDGE

JOHNSON, LEACH, and his attorneys were substantially motivated to act in concert to sanction DAVIS because of his protected political beliefs, speech, associations, and other activities described in the Final Judgment, the Motion to Dismiss, Motion for Sanctions, and Proposed Final Judgment.

78.     Moreover, LEACH, his attorneys, and Judge Johnson conspired and acted in concert to impose unconstitutionally excessive fines on DAVIS in the grossly disproportional amount of $50,000 because of his protected political beliefs, speech, associations and other activities described herein.

79.     On July 8, 2024, Judge Johnson entered an Amended Final Judgment with immaterial minor edits to the original version to dispose of a third-party petition to bring TNM into the lawsuit because of an indemnity agreement between TNM and McComb, which TNM was refusing to honor.  LEACH's attorneys had initially indicated a willingness to allow the claim but later changed their minds, which led to the parties' agreeing to voluntarily dismiss this petition.

## H. County Clerk, LILA DEAKLE's participation in the retaliation effort.

80.     Because McComb is indigent, on June 28, 2024, she filed the Affidavit of Inability to Pay Court Costs attached hereto as **Exhibit J** so that she could appeal the extreme and outrageous amount of attorneys' fees and sanctions assessed against her in the Final Judgment without paying court costs.  McComb is unable to pay DAVIS for representation in the appeal and is certainly unable to pay court costs.

81.     On July 3, 2024, DEAKLE took it upon herself to file the Motion to Contest Petitioner's Sworn Statement of Inability to Pay Costs (the "Clerk's Motion"), attached hereto as **Exhibit K**.  As set forth in McComb's Response to DEAKLE's motion, attached hereto as **Exhibit L**, the motion is patently frivolous and downright nonsensical.

82.     Rule 145(e)(1) of the Texas Rules of Civil Procedure ("TRCP") states: "A motion filed by the clerk, the court reporter, or a party must contain sworn evidence--not merely allegations--either that the Statement was materially false when made or that because of changed circumstances, it is no longer true." TRCP Rule 145(e)(1).  "The filing of a Statement of Inability to Afford Payment of Court Costs is all that is needed to require the clerk to provide ordinary services without payment of fees and costs."  *In Interest of A.M.*, 557 S.W.3d 607, 608 (Tex. App.—El Paso 2016, no pet.).  "The court may order the declarant to pay costs *only* if the motion contains sworn evidence, not merely on information and belief." *Id.* (emphasis in original).

83.     DEAKLE failed, however, to submit any evidence whatsoever that the statements in McComb's Affidavit were false when made or that circumstances have materially changed.

84.     DEAKLE's so-called "evidence" was threefold: (1) Plaintiff "is represented by an attorney," (2) "there is no record of an IOLTA Certificate," and (3) "Plaintiff's attorney filed a Petition in Intervention on June 6, 2024 in this matter evidencing a 3rd party has been paying plaintiffs legal fees." **Exhibit K**.

85.     It is difficult to overstate the patent absurdity and frivolity of DEAKLE's contentions in support of her motion.  DEAKLE's contention that Plaintiff has an attorney is, of course, not evidence that she is *paying* for an attorney and the petition in interevention she cites to support her statement that "a 3rd party has been paying plaintiffs attorneys fees" directly contradicts this statement.

86.     Contrary to the DEAKLE's false assertion, the entire purpose of the petition in intervention was to hold TNM liable for *refusing* to pay McComb's attorney's fees.  *See* **Exhibit M**, PMDA's Petition in Intervention, pp. 8–10 (causes of action based on TNM's refusal to honor its agreement to pay for McComb's attorneys fees and injuries to Plaintiff's

counsel's law firm for having to continue to litigate this case without compensation); *see also id.* at Exhibit 2 (TNM's general counsel confirming by email to DAVIS that TNM was refusing to pay any further legal fees in this case).

87.     As to DEAKLE's allegation relating to the IOLTA certificate, there is no applicable rule requiring an "IOLTA Certificate" to be attached to a Statement of Inability to Afford Payment of Court Costs under Rule 145.  *See* TRCP Rule 145; *In Interest of A.M.*, 557 S.W.3d at 608.  The sole reference to an "IOLTA Certificate" comes in the form of a 2005 comment to Rule 145 which states, "The Rule is amended to prohibit the contest of an affidavit that is accompanied by an attorney's IOLTA certificate."  Rule 145, COMMENT— 2005.

88.     Clearly, this comment indicates only that if an IOLTA certificate is attached, then it prohibits a contest.  No reasonable reading of Rule 145 or the 2005 comment could possibly be construed to indicate that a lack of an IOLTA certificate can be used as evidence that Plaintiff's Affidavit was materially false or that circumstances have changed.

89.     Because no reasonable reader of PMDA's Petition in Intervention and Rule 145 could have made the conclusions DEAKLE made from her reading of them, it is evident that DEAKLE filed her motion in bad faith.  The ostensible purpose would be to further retaliate against McComb and DAVIS because of their political beliefs and activities described herein. DEAKLE is politically aligned with LEACH and JUDGE JOHNSON.  Therefore, she was substantially motivated to file her motion in retaliation against McComb and DAVIS.

## VI.
## CAUSES OF ACTION

**A.  COUNT ONE - 42 U.S.C. § 1983: Conspiracy and conduct to retaliate against DAVIS for protected First Amendment activity.**

90.     DAVIS incorporates all of the allegations stated above as though fully set forth herein.

91.     DAVIS engaged in the constitutionally protected activity herein by associating with TNM and McComb and their political beliefs and activities and by expressing his political beliefs on X and through his activities described above.

92.     DAVIS further engaged in constitutionally protected activity by making a speech during the public comment segment of a school board meeting and engaging in the expressive activity of serving the school board president with a lawsuit during the speech that was based on the subject of the speech he was making.  DAVIS's intent with this expressive act was to bring public attention to the egregious civil rights violations of the school board president so that she may be held accountable and that the First Amendment rights of the plaintiffs and others like them in the future would be protected.  A reasonable person would perceive this to be DAVIS's intent, and DAVIS's expressive act was successful in that regard, as evidenced by the many donations received.

93.     DAVIS further engaged in constitutionally protected activity by publicly commenting on the humorous nature of LEACH's unexpected overreaction to being served with McComb's lawsuit during legislative session and giving his constitutionally protected opinion that legislators like LEACH seem to believe they are too important to be served at their workplace like everyone else in society.

94.     DAVIS further engaged in constitutionally protected activity by assisting TNM with its expressive acts of having LEACH served at the capitol and issuing a press release in connection with the event.

95.     DAVIS further engaged in constitutionally protected activity by publicly stating his beliefs that Biden and other members were engaged in crime of treason and giving his opinions on the importance and effect of the McComb lawsuit on the X social media platform.

96.     DAVIS further engaged in constitutionally protected activity by associating himself with the TEXIT movement, the MAGA movement and grassroots conservatism on his various social media platforms, and this was known to LEACH and his attorneys who monitored DAVIS's X account.  DAVIS's X account profile and various posts make his political associations clear.

97.     LEACH conspired with his attorneys, WHITNEY DAVIS, JONATHAN CONE, and EKD and with JUDGE JOHNSON and LILA DEAKLE (collectively, the "Conspirators") to retaliate against DAVIS by seeking and entering sanctions against him for his protected First Amendment activities and then filing the frivolous Clerk's Motion to force DAVIS to expend more uncompensated time to try and obtain relief for McComb from an appellate court.

98.     The Conspirators had a meeting of the minds to retaliate against DAVIS evidenced by the allegations, findings, and conclusions set forth in the Motion to Dismiss, Motion for Sanctions, Proposed Final Judgment, Final Judgment, and Clerk's Motion attached hereto.  The allegations, findings, and conclusions contained in these documents specifically reference DAVIS's protected First Amendment activity, including his associations, as grounds for the $50,000 of sanctions Judge Johnson awarded to LEACH against DAVIS at LEACH and his attorneys' request.

99.     LEACH's attorneys and JUDGE JOHNSON knew that LEACH was requesting to have DAVIS sanctioned because of his protected First Amendment activity, and acted in concert with LEACH to violate DAVIS's constitutional rights by preparing legal documents for this purpose and entering the Final Judgment, which admit that DAVIS's protected activities were the basis for the sanctions.

100.    JUDGE JOHNSON's Final Judgment instructs DEAKLE, as the County Clerk, to issue all writs processes necessary to enforce the judgment.  DEAKLE, revealed her

intent to participate in the conspiracy to retaliate against DAVIS by filing the frivolous Clerk's Motion in bad faith. DEAKLE will issue writs and process to enforce the sanctions against DAVIS at the request of LEACH and his attorneys.

101. The Conspirators were substantially motivated by DAVIS's protected First Amendment activity described herein. The Conspirator have contempt for DAVIS's political beliefs, speech, and association with TEXIT, TNM, MAGA, and/or grassroots conservatism and desired to punish him for the same.

102. DAVIS has suffered injury as a result of the Conspirator's actions taken in concert, who acted under the color of law through JUDGE JOHNSON and DEAKLE to retaliate against DAVIS because of his protected First Amendment activities by imposing excessive sanctions on him and by requiring him to respond to the Clerk's Motion.

103. Specifically, DAVIS has suffered a severe and debilitating amount of stress, anxiety, sleeplessness, and mental anguish as a result of the Conspirators' actions. DAVIS has worked extremely hard to establish his law firm, which has only been in full time operations for less than three years, and to make a livable wage therefrom. Because DAVIS has a negative net worth, sanctions in the amount of $50,000 would have a devastating financial impact on DAVIS.

104. The stress and anxiety of figuring out how to avoid complete financial disaster as a result of the Conspirator's actions has resulted in many sleepless nights for DAVIS and has deprived him of the enjoyment of life on many days.

105. In addition, DAVIS has had to spend numerous hours researching and consulting with others and preparing drafts of court documents in his attempt to defend himself against financial ruin because of the Conspirators' retaliatory actions against him. These are hours that DAVIS otherwise would have devoted to generating income for his law

practice through billable hours and marketing activities.   Thus, DAVIS has also suffered financial loss in the value of his law firm business and the value of his billable hours.

106.    These injuries would chill a person of ordinary firmness from continuing to engage in the types of protected First Amendment activities described herein.

**B.  COUNT TWO - 42 U.S.C. § 1983: Conspiracy and conduct to deprive of constitutional rights by imposing an excessive fine in violation of the Eighth Amendment.**

107.    DAVIS incorporates all of the allegations stated above and as though fully set forth herein.

108.    LEACH conspired with and acted in concert with the other Conspirators to impose punitive and excessive fine on DAVIS in violation of his Eighth Amendment right not to be subject to excessive fines.

109.    The $50,000 fine in the form of sanctions was unwarranted because DAVIS did not commit any breach of ethics, did not file a frivolous pleading, and did not otherwise commit any other act that would merit sanctions at all.

110.    DAVIS filed McComb's lawsuit to redress her legitimate grievance of being publicly accused of treason and sedition, which are crimes, for her political activity that was not criminal in nature, and, by extension, to redress TNM's and its other members similar grievances by clarifying that TEXIT advocacy is not a crime of treason or sedition.

111.    At worst, the effect of the lawsuit would have resulted in LEACH either clarifying that he was not accusing McComb of any actual crime as a settlement condition, or likely a nominal amount of damages if he refused.   LEACH could have avoided responding to the lawsuit entirely by merely issuing a statement clarifying he was not accusing McComb of a crime.

112.    DAVIS researched the matter and determined that there was a good faith basis to argue that a reasonable reader could take LEACH's statement to be a defamatory statement of fact actionable under Texas law.

113.    DAVIS's other activities the Conspirators listed in their various court filings attached hereto were protected under the First Amendment, and therefore, did not merit sanctions.

114.    Thus, the $50,000 fine in the form of sanctions was not only entirely unwarranted but, even viewed in the very best light, it was grossly disproportional to DAVIS's actions sought to be punished.

115.    The Conspirators acted in concert with JUDGE JOHNSON under color of law to impose the unconstitutionally excessive fine on DAVIS, which DEAKLE and LEACH's attorneys will enforce, in violation of DAVIS's Eighth Amendment rights.

116.    DAVIS suffered the same mental anguish and economic injuries described in COUNT ONE as a result of LEACH's actions in concert with the other Conspirators.

## VII.
## CONDITIONS PRECEDENT

117.    All conditions precedent to DAVIS's claims for relief have been performed or have occurred.

## VIII.
## PUNITIVE DAMAGES

118.    DAVIS seeks punitive damages against the Conspirators because their conduct was motivated by evil motive or intent, and/or involves reckless or callous indifference to DAVIS's federally protected constitutional rights.

119.    LEACH and his attorneys intentionally retaliated against both DAVIS and McComb by seeking an extreme and outrageous amount of attorneys' fees, costs, and

sanctions, which they knew that JUDGE JOHNSON would rubber-stamp and DEAKLE would enforce because her political views and motivations are aligned with theirs.

120.   In doing so, they took a state law designed to *protect* the rights of individuals to participate in the political process and turned it on its head by weaponizing it against DAVIS and McComb to *punish* them for exercising their protected rights and attempting to to correct the public record regarding TEXIT advocacy.

121.   LEACH, his attorneys, and JUDGE JOHNSON all knew that the amount of attorneys' fees, costs, and sanctions sought and granted were extreme and outrageous, yet they carried out their conspiracy with malicious intent to do severe financial harm to DAVIS and McComb because they despise DAVIS and McComb's political views and activities.  They not only had no regard for DAVIS and McComb's constitutional rights but acted with actual intent to violate those rights.

122.   The Conspirators intent to violate DAVIS and McComb's rights is further evidenced by the fact DAVIS sent several emails to LEACH's attorneys pointing out that their actions were in violation of the constitutional rights described herein.  LEACH's attorneys ignored DAVIS's warnings and proceeded to move forward with judgment against DAVIS and McComb in concert with JUDGE JOHNSON and in callous indifference to DAVIS and McComb's constitutional rights.

## IX.
## ATTORNEYS FEES & COSTS

123.   Plaintiffs are entitled to an award of attorneys' fees and costs under 42 U.S.C. § 1988(b).

## X.
## PRAYER FOR RELIEF

WHEREFORE, Intervenor, PAUL DAVIS, prays that the Court grant him judgment against the Conspirators in the following forms of relief:

a. An award of nominal, compensatory, and punitive damages to DAVIS for the injuries described herein in the amount of at least $1 million against JEFFREY LEACH, JONATHAN CONE, WHITNEY DAVIS, EKD, and LILA DEAKLE, jointly and severally.

b. Permanent injunctive relief restraining LEACH and anyone acting on his behalf from ever attempting to collect the $50,000 of sanctions from DAVIS;

c. Permanent injunctive relief restraining DEAKLE and anyone acting on her behalf from ever issuing writs or process to enforce the Final Judgment against DAVIS;

d. Permanent injunctive relief ordering LYNN MARIE JOHNSON to vacate the portion of the Final Judgment, as amended, that awarded LEACH $50,000 of sanctions against DAVIS and restraining her from reinstating the award;

e. Reasonable and necessary attorneys' fees, costs, and expenses against the Conspirators, jointly and severally;

f. Pre-judgment and post-judgment interest;

g. All other and further relief to which DAVIS may be entitled.

Respectfully submitted,

/s/ *Paul M. Davis*
Paul M. Davis
Paul M. Davis & Associates, P.C.
9355 John W. Elliott Dr.
Suite 25454
Frisco, TX 75033
945-348-7884
paul@fireduptxlawyer.com

PRO SE